In re Noble J. HAMILTON, Debtor.

**FIRST NATIONAL BANK OF COLORADO SPRINGS, Plaintiff,**

v.

**Noble J. HAMILTON, Defendant.**

**Bankruptcy No. 81 Mc 1105.**

United States Bankruptcy Court, D. Colorado.

March 22, 1982.

Ronald M. Martin, Colorado Springs, Colo., for plaintiff.

Jimmie D. Mills, Denver, Colo., for debtor.

## ORDER DETERMINING RIGHTS OF BANK

JOHN F. McGRATH, Bankruptcy Judge.

The Court is here called upon to determine the rights of the Plaintiff, First National Bank of Colorado Springs (Bank), regarding its original security agreement with the Debtor/Defendant, Noble J. Hamilton, covering after-acquired property, and regarding the subsequent oral agreement between these same parties whereby the Bank was to receive 50 percent of the proceeds from all monies received upon which the Bank had an interest. Specifically, the questions which must be addressed in order to make a complete determination of the Bank's rights are: (1) Is the application of 11 U.S.C. § 552(a) to the Bank's security interest in the Debtor's after-acquired property unconstitutional? (2) Does the Bank's security interest apply to crops planted after the filing of the Debtor/Defendant's Petition? (3) Is the Bank entitled to 50 percent of the proceeds of the crops in existence before the filing of the Petition, or is the Bank, because of a breach in the parties' agreement, entitled to 100 percent of the proceeds, or is the Debtor/Defendant, as debtor-in-possession, entitled to an offset against the proceeds received for the crops for the costs of planting, maintaining, harvesting, and marketing those crops?

The security agreement between the parties was signed on February 1, 1979, and the crops and the land upon which the crops were to be grown were set forth. The crops consisted of sod, trees, and alfalfa. The parties agree that all alfalfa and trees were in existence at the time of filing. The only dispute, therefore, is regarding the sod. On April 16, 1981, when the Debtor filed his Chapter 11 proceeding, the Debtor had 367 acres of sod. He now has 190 acres in sod. Therefore, the acreage in dispute is the 177 acre difference.

The subsequent agreement between the parties was entered into on May 21, 1981, after the filing of the Complaint in this action. By the terms of this agreement the Bank was to receive 50 percent of the proceeds from all monies received by the Debtor upon which the Bank held a security interest. This agreement was never fully executed or filed with the Court, but its existence is not disputed.

A third agreement between the parties has been reached. The parties have agreed that from October 8, 1981, the date of the hearing, to the date when the Court makes a final decision on the matters in controversy, the Debtor will pay the Bank 30 percent

of the proceeds received from the sale of the crops. However, the Bank claims that it is entitled to 100 percent of these proceeds also. The parties also agree that the Bank is granted relief from stay on all its property rights, and the parties further agree that all of the proceeds from sod sold up until October 8, 1981, are proceeds from sod that was in place on April 16, 1981, the date of the filing of the Chapter 11 Petition.

11 U.S.C. § 552 provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 544, 545, 547, and 548 of this title, if the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

■ Regarding the constitutionality of the application of § 552(a) to the Bank's security interest, the Bank argues that § 552(a) as applied to secured creditors whose security interest in after-acquired property arose prior to the effective date of the Act is unconstitutional as a taking of property because the Bank had a vested property right in the Debtor's after-acquired property. The Bank bolsters its argument by pointing out that this Court has held, in *Groves v. Household Finance Company*, 9 B.R. 775 (Bkrtcy.Colo.1981), that 11 U.S.C. § 522(f) cannot be constitutionally retroactively applied to agreements arising before the effective date of the Bankruptcy Reform Act of 1978, October 1, 1979. The Bank argues that the situation here is identical to that in *Groves, supra.*

As regards the Bank's argument that § 552 is unconstitutional as a taking of property because the Bank had a vested property right in the Debtor's after-acquired crops, the Court must disagree. It is impossible on the face to have a vested property right in after-acquired property. This is so because, by definition, after-acquired property is a mere contingency. Since after-acquired property is not in existence at the time of the agreement the most which the Bank could have acquired by their agreement with the Debtor was a vested interest, which, had the property ever come into existence, would have become a vested property right. Before the Bank's interest became a property right, that interest was altered by § 552 of the Bankruptcy Code. This Court stated in *In re Martin Alvarado, et al.*, 81 B 03645 Mc and 81 B 03985, September 29, 1981, that "(b)y its very nature, the filing of a Petition in bankruptcy acts to breach any and all contracts between the Debtor and (his) creditors..." *Alvarado* concerned five assignments of proceeds from the Debtors to various entities through Mountain Empire Dairymen's Association. The Debtors sought to have these assignments, which were transfers of both property and interest, set aside. The Court, in setting aside three of the five assignments, cited *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), as standing for the proposition that any and all assignments are *ipso facto* terminated by the filing of a bankruptcy case. Again, the Court reiterates, the Bankruptcy Code alters contract rights. This is allowable because the Fifth Amendment to the United States Constitution protects property rights and not contract rights. U.S.Const.Amend. V, and because Congress, unlike the states, is not prohibited from impairing the obligation of contract. *Rodrock v. Security Industrial Bank*, 642 F.2d 1193, 1197 (1981).

Thus, as regards the Bank's argument that the situation here is identical to that in *Groves, supra,* it can be seen that the two situations differ radically. Whereas § 522(f) deals with a creditor's vested security interest in property, § 552(a) deals with a contingent interest only. The argument that both fact situations are the same and must, therefore, be similarly treated cannot stand. For this reason, the Court now holds that the application of § 552 to the parties' agreement is not in violation of the Constitution of the United States.

■ Having reached the proposition that application of § 552 to the agreement at hand is constitutional, the Court must now determine the result of the application of § 552 to the parties' agreement. The Debtor argues that § 552(a) precludes the fixing of a lien resulting from a prepetition security agreement on property acquired after the filing of the Petition. The Court is convinced that this is a proper interpretation. From the legislative history it seems clear that this is exactly the effect which Congress intended. The Senate report, discussing § 552 says:

> Under the Uniform Commercial Code, article 9, creditors may take security interest in after-acquired property. Section 552 governs the effect of such a prepetition security interest in postpetition property. It applies to all security interests as defined in section 101(37) of the bankruptcy code, not only to U.C.C. security interests.

> As a general rule, if a security agreement is entered into before the commencement of the case, then property that the estate acquires is not subject to the security interest created by a provision in the security agreement extending the security interest to after-acquired property. . . .

Senate Report No. 95–989, 95th Cong., 2nd Sess. (1978) 91, U.S.Code Cong. & Admin. News 1978, pp. 5787, 5877. Thus, § 552 applies only to the crops which were in existence at the time of the filing of the Petition.

■ The Debtor further argues that § 552(b) is not applicable to the new crops. Again, the Court is convinced of the accuracy of this conclusion. The language, although far from clear, supports this conclusion. Further, in regard to § 552(b), Collier's points out that ". . .(i)t must be emphasized, however, that subsection (b) creates an exception for proceeds generated by prepetition collateral, and not for after-acquired property, other than proceeds, product, offspring, rents, and profits, that would otherwise be collateral under the security agreement." 4 Collier on Bankruptcy (15th Ed.) p. 552–5, ¶ 552.02.

The next issue to which the Court must address itself is the percentage of proceeds to which the Bank is entitled. From the above discussion, it is clear that the only proceeds to which the Bank has any entitlement are the proceeds from those crops which were in existence at the time of the filing of the Petition and not for any crops which were planted after that date, i.e., the 177 acre difference that was sold between May 1, 1981, and October 8, 1981. By the terms of the subsequent agreement between the parties, the Bank was to receive 50 percent of the proceeds of these crops. The Bank argues that the requirement that the Debtor remit 50 percent of the proceeds of the sale of the collateral was a condition precedent to the formation of the contract. Because the Debtor did not remit the 50 percent the Bank claims that a contract was never formed and thus the Bank is entitled to 100 percent of the proceeds. In the alternative, the Bank argues that the failure to pay the 50 percent at the time of the sale was a substantial breach of the contract, discharging the parties from future performance. Due to the breach the Bank does not have to accept 50 percent of the proceeds and can now demand 100 percent.

The Debtor argues that the parties never agreed to a time for performance and that performance is not yet due. The Debtor further argues that in any event the Bank would not be entitled to 100 percent of the proceeds because § 506(c) allows him to offset, against the proceeds received for crops, the costs of planting, maintaining, harvesting, and marketing those crops.

■ The Court first addresses the Bank's argument that the remittance of the 50 percent of the proceeds was a condition precedent to the formation of a contract. The Court cannot accept this interpretation. Instead, it appears that this was a simple contract with a simple exchange of benefits and obligations. The Bank exchanged its right to demand 100 percent of the proceeds in return for the benefit of having the Debtor remain in business and pay the Bank 50 percent of the proceeds. The Debtor, in exchange for the right to use 50 percent of the proceeds to run his business, agreed to pay the Bank 50 percent of the proceeds.

■ The alternative argument of the Bank, that the failure to pay 50 percent was a substantial breach entitling the parties to suspend their future performance and entitling the Bank to demand 100 percent, seems to have merit. According to the Restatement of Contracts, § 275, the criteria to be used in determining the materiality of a breach are: the amount of benefit received, the adequacy of the damages, the extent of part performance, the hardship to the breaching party should the agreement be terminated, the extent to which the behavior was negligent or willful, and the likelihood of full performance.

These criteria seem to weigh heavily in favor of the Bank. The Bank does not appear to have received any benefit from the May 21, 1981, contract whatsoever. Damages could fully compensate the Bank, but since the Debtor has been unable to perform the contract, it seems unlikely that he would have the ability to adequately compensate the Bank in damages. There does appear to have been one payment by the Debtor for one 15 day period, but because the obligation was approximately five months old at the time of the hearing, this performance seems minimal. The nonperformance of the Debtor does not appear to have been negligent or willful and such is not alleged. Likelihood of full performance because of the economic condition of the Debtor seems to be highly unlikely. The only criterion which balances on the side of the Debtor in order to help lessen the materiality of the breach is the fact that should the agreement be terminated the harm to the Debtor would be substantial. This is so because the Debtor has been using these proceeds to run his business. Even the significance of this factor is diminished when it is noted that in the case of *Aetna Casualty and Surety Company v. Noble J. Hamilton*, No. 81 K 2602, filed on December 21, 1981, relief from stay was granted to Aetna Casualty and Surety Company in order that they might begin foreclosure on the property of the Debtor.

Thus, the Court determines that the breach by the Debtor was material. However, it does not necessarily follow that the Bank can now demand 100 percent of the proceeds. Before discussing the amount due, the Court first addresses the Debtor's argument that the Debtor is not in breach because the time for performance is not yet due. This argument is not acceptable to the Court because it is impossible to imagine what incentive the Bank could have to trade a security agreement for 100 percent of the proceeds in which the date of the payment was uncertain for a security agreement for 50 percent of the proceeds in which the date of payment was uncertain. The only circumstances under which an exchange of this type would make sense would be if the Bank would have traded the 100 percent payment on an uncertain date for the 50 percent payment at a specific time. That specific time could not reasonably be any time other than the date of the sale of the proceeds. To the Court, this seems like the only reasonable time when the legal obligation could have arisen.

Regarding the percentage of payment to which the Bank is entitled, the Court accepts the reasoning of the Debtor that § 552(b) is subject to 11 U.S.C. § 506(c) and § 506(c) does not allow the Bank to take 100 percent of the proceeds. In pertinent part, § 506 says: "(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any

benefit to the holder of such claim." Of course, under a Chapter 11 case the debtor-in-possession stands in the position of a trustee. The legislative history of § 552(b) clarifies the meaning of § 506(c):

> ... If the security agreement extends to proceeds, product, offspring, rents, or profits of property that the debtor had before the commencement of the case, then the proceeds, etc., continue to be subject to the security interest, except to the extent that the estate acquired the proceeds to the prejudice of other creditors holding unsecured claims. "Extends to" as used here would include an automatically arising security interest in proceeds, as permitted under the 1972 version of the Uniform Commercial Code, as well as an interest in proceeds specifically designated, as required under the 1962 Code or similar statutes covering property not covered by the Code. "Prejudice" is not intended to be a broad term here, but is designed to cover the situation where the estate expends funds that result in an increase in the value of collateral. The exception is to cover the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the fund available for general unsecured creditors. The term "proceeds" is not limited to the technical definition of that term in the U.C.C., but covers any property into which property subject to the security interest is converted.

House Report No. 95–595, 95th Cong., 1st Sess. (1977) 376–377, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6332–6333.

Thus the Debtor is allowed to recover from the proceeds the reasonable, necessary costs of maintaining, harvesting, and marketing of these crops. Because we are concerned only with the crops which had been planted at the time of the filing of the Petition, however, under no circumstances would the Debtor be allowed to recover his planting costs from the proceeds.

WHEREFORE, IT IS ORDERED that the Plaintiff/The First National Bank of Colorado Springs, pursuant to 11 U.S.C. § 522, is entitled to recover 100 percent of the proceeds from the sale of all crops after the May 21, 1981, agreement, with deductions by the Debtor/Defendant for the costs of maintaining, harvesting, and marketing the crops, pursuant to 11 U.S.C. § 506(c), and it is

FURTHER ORDERED that the Bank is not entitled to proceeds from the replanting of the 177 acres.