**In the Matter of Ronald Lee VANASDALE and Mary Ellen Vanasdale, Debtors.**

**Bankruptcy No. 685–00255.**

United States Bankruptcy Court, N.D. Ohio.

June 5, 1986.

James R. Moats, Esq. of Kincaid, Palmer and Randall, Columbus, Ohio, for BancOhio Nat. Bank.

Mary Ann Rabin, Cleveland, Ohio and James W. Pry, II, Spurlock, Sears, Pry and Griebling, Bucyrus, Ohio, for debtors.

Thomas J. Budd, II, Ashland, Ohio, for First Nat. Bank of Shelby.

FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW IN RE: RE-LIEF FROM STAY AND ABANDON-MENT, VALUATION OF COLLAT-ERAL, DETERMINATION OF SE-CURED STATUS AND PRIORITY OF LIENS

JAMES H. WILLIAMS, Bankruptcy Judge.

## STATEMENT OF THE CASE

The debtors, Ronald Lee Vanasdale and Mary Ellen Vanasdale, filed, on March 12, 1985, their voluntary petition, commencing a proceeding under Chapter 7 of Title 11 of the United States Code. The debtors describe themselves as self employed in the farming business. Their operation, at times relevant herein, was conducted on land located in Richland, Crawford and Huron Counties, Ohio.

The initial meeting of creditors, pursuant to 11 U.S.C. § 341, was scheduled for April 18, 1985. Prior thereto, on March 15, 1985, the debtors presented a "Motion for Authority to Incur Post-Petition Secured Debt." They represented that they intended "to retain and reaffirm the debts owed to the creditors who hold mortgages on the farmland that is property of the estate;" that the value of the farmland was less than the balances due on the mortgages and hence there would be no equity for the estate; that the funds would be used "to purchase seed for the next growing season;" and that the proceeds of the crops grown would secure their intended new borrowing. Finally, the debtors asserted that there was insufficient time for a hearing, as at least one of the potential lenders, First National Bank of Shelby (First National) had imposed a March 20, 1985 deadline for receipt of an order from the court granting the debtors' request.

The court entered an order on March 20, 1985 that granted the debtors' motion, specifically providing that the proceeds were to be "used to purchase seed for the next growing season," ... "to be secured by the proceeds of the crop grown on the land." "The liens," the court declared, would "be the first, best and only liens against the growing crops of the Vanasdales."

The court ordered notice to be sent to all creditors and the interim trustee of the entry of its order and provided that to the extent that any objections thereto were not resolved at the Section 341 meeting of creditors, a hearing before the court would be scheduled at a future date. Only the interim trustee filed an objection, but presumably was satisfied in that he has not pressed for a hearing on his objection in the course of his administration of the estate as trustee.

On April 11, 1985, seven days before the Section 341 meeting of creditors, BancOhio National Bank (BancOhio) filed a motion seeking abandonment of property of the estate and relief from the automatic stay imposed by 11 U.S.C. § 362. Among various items of collateral for the liens BancOhio wishes abandoned and freed from the stay are "[a]ll crops of any kind, growing or to be grown ... including specifically, but not limited to, all crops growing or to be grown during 1983 and 1984."

Repeated continuances of the requisite hearing on BancOhio's motion were either requested or agreed to by BancOhio and while the motion remained in a pending status, the debtors filed their own motion to value BancOhio's collateral while objecting to abandonment and relief from the

automatic stay. BancOhio added a further motion to the court's docket, this one for a determination of its secured status, a fixing of priority of liens and its own request for the valuation of its collateral. All matters were consolidated for hearing purposes, and following a hearing at which stipulations of fact were entered, evidence was taken and arguments of counsel were heard, the parties presented proposed findings of fact and conclusions of law. Based on all of the foregoing, the court enters its findings of fact, opinion and conclusions of law herewith.

## FINDINGS OF FACT

1. At the date of the debtors' filing of their voluntary petition for relief under the bankruptcy laws, March 12, 1985, their indebtedness to BancOhio totalled $560,645.10. The obligation is grounded upon two note loans made in 1981 for $400,000.00 and $135,000.00 respectively, subsequently consolidated by the terms of an Extension and Modification Agreement executed by the debtors and BancOhio on January 20, 1983 and on which there remains unpaid $476,050.07 with interest at $134.96 per day. According to the Extension and Modification Agreement, the consolidated indebtedness would mature on December 15, 1984 with all unpaid principal and interest being then due and payable in full. Additionally, BancOhio claims $84,595.03 is due for unpaid lease payments on a Quonset steel frame building and accessories, leased by BancOhio to the debtors on September 14, 1981 for a ten year period. BancOhio made no advances for crops in the years 1982, 1983, 1984 and 1985.

2. Securing the indebtedness are so-called Open-End Mortgages, duly recorded in the appropriate county recorders' offices, and security agreements granting security interests in the debtors' machinery, equipment, implements and titled vehicles, stored crops and all crops growing on or to be grown on real estate described in the security agreements. The crops referred to included, but were not limited to, those "growing or to be grown during 1983 and 1984." Financing statements in proper forms were filed as required by law and bore the same language as set forth in the security agreements.

3. The Extension and Modification Agreement was altered slightly, at debtors' counsel's insistence, before its execution. Its paragraph 7, with the new matter insisted upon by debtors' counsel underscored, reads as follows:

The Borrowers do further convenant and agree that the Note and the Master Note as described herein will continue to be secured by all of the collateral as previously described herein. In addition, Borrowers do further convenant and agree that they will execute and deliver to Bank any and all additional security agreements and financing statements to further evidence the security interest of Bank in the Borrowers' crops including those presently growing, stored, or to be grown in the future, *only on the crops described in the existing financing statements and security agreements.*

4. The parties have agreed that the machinery, equipment, implements and titled vehicles upon which BancOhio has liens have an aggregate fair market value of $91,000.00

5. The Quonset steel framed building's value is in dispute. The debtors and BancOhio have each presented an appraisal and agreed to the court's fixing of the value, based thereon.

6. The value of BancOhio's security interest in the real estate of the debtors is, by agreement of the parties as set forth in their briefs, nil. Prior validly executed and recorded mortgages secure indebtedness substantially greater than the value of the real estate.

7. The parties further agree, according to their briefs, that any crops planted and harvested after the date of filing, March 12, 1985, are not subject to any security interest of BancOhio.

8. If BancOhio is found to hold a valid lien insofar as the debtors' 1985 wheat crop (which the court notes was planted and

growing at the time of the issuance of the March 20, 1985 order authorizing the debtors' post-petition borrowing) is concerned, BancOhio's interest is limited to 69.8% of said crop or its proceeds, based upon the amount of the debtors' land affected by BancOhio's lien. In terms of acreage, BancOhio's lien extends to approximately 262 acres.

9. All of the debtors' 1985 wheat crop was entered into the United States' Grain Reserve Program. The purpose of the Grain Reserve Program is to keep grain off the market so that an over supply of wheat does not further reduce the market price that farmers may obtain for that grain. The United States insists upon subrogation agreements from all creditors who have an interest in a farmer's growing crops in exchange for a security interest in the proceeds obtained through the Grain Reserve Program. While such agreements were obtained from lenders who acted in accordance with the court's March 20, 1985 order authorizing the post-petition borrowing, BancOhio was not asked for such a subrogation, the government's representative in charge of the Program having relied on the finding therein that such new lenders held "the first, best, and only liens against the growing crops of the Vanasdales."

10. As a result of their enrollment in the 1985 Grain Reserve Program, the debtors received loan proceeds totalling $108,-044.56 and the United States took a lien on the 30,738 bushels of wheat harvested by the debtors.

11. The United States currently holds the warehouse receipts for this grain, and this grain remains subject to the restrictions of the Grain Reserve Program.

12. Upon entry of the March 20, 1985 order permitting post petition borrowing, debtors borrowed $300,386.00 from First National. The debtors executed a promissory note and security agreement which pledged as collateral:

> All farm products consisting of crops including but not limited to corn, oats, wheat, soybeans, straw & hay growing, to be grown or stored on the described

real estate, together with all proceeds thereof. The above crops are growing, to be grown or stored on the real estate described on the attached schedule. This financing statement is to be filed for record in the real estate records under the recorded owner listed on the attached schedule.

First National perfected its crop liens with appropriate filings in the counties where debtors' crops were growing and with the office of the Secretary of State of Ohio.

## OPINION

### 1

■ The parties' major point of dispute is, of course, over the existence of a lien in favor of BancOhio on the proceeds of the 1985 wheat crop to the exclusion of any lender acting in reliance on the court's March 20, 1985 order relative to post-petition borrowing. BancOhio points to the Extension and Modification Agreement, and the security instruments executed in consumation of that agreement, which explicitly encompass, but by their terms are not limited to, "all crops growing or to be grown during 1983 and 1984," as determinative of BancOhio's superior interest in the wheat harvested in 1985.

The debtors, supported by First National, urge, just as vigorously, that the intent of the parties upon execution of the Extension and Modification Agreement was that any security interests of BancOhio terminated on December 31, 1984. They offer Mr. Vanasdale's testimony to that effect and the language added to paragraph 7 of the Agreement, quoted above in Finding of Fact number 3.

The court is not persuaded by the debtors' argument that their security agreement with BancOhio ended on December 31, 1984. The Extension and Modification Agreement's terms are hardly so explicit; its paragraph 2 recites, in its entirety:

> The maturity date for the consolidated indebtedness shall be December 15, 1984, at which time the entire amount of the

remaining principal and interest shall be due and payable in full.

Neither, however, is the court of the view that BancOhio may sit back and claim the proceeds of the wheat crop growing when the maturity date for the indebtedness was reached. At that point, the seed was in the ground at the labor and expense of the debtors; much more, including top-dressing, harvesting and marketing remained to be done in order to realize any proceeds whatsoever from the crop. The evidence was sparse, indeed, on the cost of converting the dormant seedlings in existence on December 31, 1984 to cash in the summer of 1985. The debtor, Mr. Vanasdale, testified that his seed costs for the crop in question amounted to $7,000.00; that the top-dressing cost approximately $9,000.00; and that without the top-dressing the per-acre yield would probably be one-half of the actual 72–73 bushels per acre actually yielded. Floyd J. Reinhart, an employee of the United States Department of Agriculture, estimated that the wheat in the ground, when this court entered its order on March 20, 1985, was worth approximately $20.00 per acre.

The comptroller of Horn's Crop Service, a supplier of goods and services to the agricultural industry used by the debtors, supported Mr. Vanasdale's estimates as to the cost of top-dressing, the probable results of a lack of that effort and further offered the opinion that the per-acre cost of planting wheat in the area where the debtors' farm is located is $15.00–$20.00 per acre.

BancOhio's position is that it is entitled to its aliquot share of the proceeds received by the debtors from the wheat crop harvested in 1985 in the same proportion as the number of acres of wheat covered by BancOhio's security interest bore to the total number of acres of wheat planted and harvested by the debtors. As set forth in Finding of Fact number 8 above, that proportion, expressed as a percentage of the total wheat-producing acreage, is 69.8. In support of its argument, BancOhio cites Sections 1309.14(C), 1309.25 and 1309.-40(B)(1) of the Ohio Revised Code and 11 U.S.C. § 552(b). The Ohio statutes deal with the "proceeds" of collateral and the immunity of a security interest from insolvency proceedings. Section 552(b) of the Bankruptcy Code provides:

Except as provided in section 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

BancOhio argues that the import of section 552(b) is that its lien on the wheat crop growing when the petition was filed extends to the harvest of that crop and that the court may order otherwise on the basis of "the equities of the case" only to the extent that the debtors are entitled to offset their costs in maintaining, enhancing, harvesting and marketing the crop. In support, BancOhio cites *In re Noble J. Hamilton,* 18 B.R. 868 (Bankr.D.Colo. 1982). There the court held that a bank which, prior to the filing of a bankruptcy petition, held a security interest in the crops in existence at the filing was entitled to the proceeds of those crops, subject only to the right of the debtor to recover the "reasonable, necessary costs of maintaining, harvesting and marketing of these crops." *Id.* at p. 873. The costs of planting were not allowed the debtor as an offset, however, due to the existence of the crop at the filing of the bankruptcy petition.

The debtors seek to distinguish *Hamilton* on the basis that in that case the debtors were seeking to reorganize under Chapter 11 rather than liquidate under Chapter 7. The distinction is lost upon both BancOhio and the court.

Both the debtors and First National place heavy reliance on the court's authority to balance the "equities" and, of course, suggest, for a variety of reasons, that those equities do not weigh very heavily in favor of BancOhio. The legislative history reminds us that the court's flexibility in this realm is limited. For instance,

> The provision allows the court to consider the equities in each case. In the course of such consideration, the court may evaluate any expenditures by the estate relating to proceeds and any related improvement in position of the secured party.

124 Cong.Rec.H. 11097–11098 (daily ed. Sept. 28, 1978); S. 17414 (daily ed. Oct. 6, 1978).

The evaluation spoken of finds legislative expression in Section 506(c):

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of such property to the extent of any benefit to the holder of such claim.

Amplifying on this provision, the leading treatise notes:

> Notwithstanding the secured party's security interest in proceeds, product, offspring, rents, or profits, under section 506(c) the trustee or debtor in possession may recover from the collateral "the reasonable, necessary costs and expenses of preserving, or disposing of, such property" to the extent of any benefit to the secured party; thus even if the trustee's use of collateral results in a diminution in value of the collateral, the reasonable, necessary costs and expenses of preserving or disposing of the collateral may be extracted from the collateral to the extent the secured party was benefitted by preservation or disposition of its collateral.

4 *Collier on Bankruptcy*, para. 552.02, pg. 552–6, fn. 6 (15th ed. 1985)

The debtors, supported by First National, urge that the court ought to use its equitable powers under Section 552(b) to find that BancOhio is entitled to no more than the value of the dormant wheat crop on the date of filing in March of 1985. The basis of their argument is that BancOhio loaned no crop moneys for several years prior to filing; therefore, they reason, it should not, in fairness, participate in the profits from the crop. This position seems to ignore the situation between the debtors and BancOhio on January 20, 1983 when the Extension and Modification Agreement was entered: the debtors were in default and avoided foreclosure by the bank of its security interests by agreeing to the terms of the Extension and Modification Agreement. One of those terms was the granting of the security interest now in dispute and the fact that BancOhio advanced no new moneys to further assist the farming operation is irrelevant.

To suggest, as the debtors do, that upon filing they had a right to "park their tractor," as they put it, and leave BancOhio to its own devices to realize upon its collateral is an argument for recoupment of maintenance and enhancement expenses; it is no justification for denying BancOhio its contractually granted rights in the growing crop.

■ The court disagrees with the *Hamilton* court in one respect: the costs of planting, under the circumstances here present are, in the court's opinion recoverable. Likewise, the top-dressing, harvesting and marketing costs may be deducted from the proceeds received from the wheat harvested in 1985 from the 262 acres to which BancOhio's lien attaches.

The evidence, though thin as previously noted, at least shows that the reasonable costs of planting the wheat crop in 1984 was $20 per acre or $5,240 for the 262 acres affected by BancOhio's lien; and the top-dressing was applied, according to the evidence at a cost of $9,000, or $6,282 for

the portion of the crop lands affected by that same lien. As to any and all other costs, e.g., any insecticides which might have been applied during the growing season, harvesting costs, costs of transporting the harvested grain to market and any other expenses related to marketing, the record is silent and, naturally, BancOhio urges that consideration stop there.

It is at this juncture that the court believes its equitable powers, as affirmed by Section 552(b) of the Bankruptcy Code may be employed. If the parties are unable to agree, within 20 days of the date of the order giving effect to these findings of fact and conclusions of law, as to such further costs recoverable by the debtors from the proceeds of the wheat harvested in 1985, the court will, upon request of any party, schedule a further hearing for the limited purpose of receiving evidence necessary to fix such costs.

### 2

The parties have agreed and stipulated, as noted in Finding of Fact number 4, that BancOhio has valid liens on machinery, equipment, implements and titled vehicles of the debtors with an aggregate value of $91,000.00 and the court will accept that stipulation.

### 3

█ The debtors, on September 14, 1981, entered into a lease with BancOhio for a "Quonset 108′ × 150′ ×14′ Steel Frame Building" and accessories (Quonset building). The cost of the Quonset building was stated in the lease to be $70,000. The lease expires, according to its terms, on September 14, 1991. Lessees were to pay as rent $158,453.30 in ten annual installments beginning on September 14, 1982 of $15,-845.33 each, plus applicable taxes. The lease carried an option to purchase for $17,-500, plus applicable taxes, if exercised at least 30 days prior to September 14, 1991.

The trustee, pursuant to 11 U.S.C. § 365(d)(1) had until 60 days from the order for relief on March 12, 1985 to assume or reject the lease or request more time in which to make his decision. That right expired with no such action being taken by the trustee.

The court is asked, on the basis of appraisals submitted by the debtors and BancOhio, to value the building. The appraisals are, politely described, concise. That offered by BancOhio is as of February 1, 1985 and gives a depreciated value of $63,000, in place. As a liquidation value, the BancOhio appraisal assigns $10,000 to $15,000. Debtors' appraisal is even less elaborate and simply gives a value, if the structure remains on the premises, of $40,-000 and $15,000 if it is removed.

BancOhio asserts that in addition to the fair market value of the building in place, which it urges be fixed at $63,000, it is entitled to the purchase option price of $17,500. The court will fix a value for the Quonset building of $50,000. In so doing it is mindful of its charge under 11 U.S.C. § 506(a) which reads in pertinent part:

Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditors' interest.

The debtors have indicated, by word and deed, their intention to remain in farming and the building is therefore valued in light of its continued use. The optional purchase price under the rejected lease is ignored as now irrelevant.

### 4

Finally to be considered is the position of the United States. The government, according to its post-petition brief, takes no position with respect to the valuation of BancOhio's secured interest in the proceeds of the wheat harvested in 1985, but it does vigorously assert that its security interest in the wheat itself is superior to Banc-Ohio's. Without exploring the theories advanced by the government in support of its position, it is sufficient to note that Banc-Ohio, in its own post-petition brief, states that if, as it has, the court finds that Banc Ohio has a security interest in the proceeds, "then BancOhio is not interested in

the wheat crop itself." (BancOhio's Proposed Findings of Fact and Conclusions of Law and Argument in Support Thereof, pg. 16). The government will therefore be found to be in a first position with respect to the wheat crop by virtue of BancOhio's agreement and the subrogation agreements obtained from all other potential lien claimants.

## CONCLUSIONS OF LAW

1. BancOhio has a valid and perfected first security interest in all of the machinery, equipment and motor vehicles of the debtors. The value of those items is stipulated, and found, to be $91,000.

2. The value of the Quonset building, owned by BancOhio and subject to a lease deemed rejected under 11 U.S.C. § 365(d)(1), is $50,000.

3. BancOhio had a valid and perfected security interest in all of the crops, and the proceeds therefrom, of the debtors which were planted at the time of the filing of their petition and growing on land covered by the crop filings of BancOhio. BancOhio's security interest in the proceeds realized from such crops amounts to 69.8% of the debtors' 1985 wheat crop receipts.

4. The debtors are entitled to recover from the proceeds of the 1985 wheat crop the reasonable, necessary costs of maintaining, enhancing, harvesting and marketing the crop. *See In re Noble J. Hamilton, supra.* Further, the debtors are entitled to recover the cost of planting the wheat crop, determined to be $20 per acre or $5,240 for the 262 acres affected by BancOhio's lien. In addition to $6,282 expended on the lands in question for top-dressing, the parties will either agree on other costs advanced by the debtors to bring the crop to market or appear before the court for further hearing on that issue. *See* 11 U.S.C. § 552(b).

5. Since BancOhio's security interest in the growing crops extends to proceeds under 11 U.S.C. § 552, BancOhio is not prejudiced by the court's finding that the United States retains a senior security interest in the wheat itself.

6. BancOhio's security interest in the actual wheat harvest by the debtors in 1985 is subrogated to the security interest of the United States in the same wheat.

An order consistent with the forgoing findings of fact and conclusions of law will be entered forthwith.