**In re Max Arthur OLSEN, aka Max A. Olsen, aka Max Olsen and Joan Jeanette Olsen, aka Joan J. Olsen, aka Joan Olsen, aka Joan Olsen dba Agri Supply, Debtors.**

**Bankruptcy No. 87–B–14354–M.**

United States Bankruptcy Court, D. Colorado.

May 24, 1988.

Frank Stepnowski, William L. Needler & Associates, Ltd., Chicago, Ill., for debtors.

Steven Rider, Rider & Woulf, P.C., Aurora, Colo., for the Federal Land Bank of Wichita.

Michael Westover, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, Colo., for Colorado Nat. Bank of Denver.

**MEMORANDUM OPINION AND ORDER**

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Amended Motion for Approval of Secured Borrowing Pursuant to 11 U.S.C. § 364(d) ("Motion"), filed by the Debtors-in-Possession. The two principal creditors of the Debtors, Federal Land Bank of Wichita

("FLB") and Colorado National Bank of Denver ("CNB"), each filed an Objection to the Motion. This matter came on for hearing before the Court on May 16, 1988, pursuant to the Debtors' Motion for Expedited Hearing, and because of the impending "crop planting season [which] has already commenced." The Court issues this brief Memorandum Opinion and Order in order to try and meet the immediate needs of the parties hereto.

## BACKGROUND AND FACTS

The following facts and information were submitted to the Court and are unrebutted, or otherwise stipulated to, by the parties, and thus form the basis on which this Opinion is rendered.

1. The Debtors, family farmers operating a family farm operation, filed their Chapter 11 case on November 25, 1987 in an effort to reorganize their deteriorating financial affairs and "save the family farm." Mr. Olsen is 45 years old with a degree from Colorado State University in farming and agronomy studies, and has been farming this property near Yuma, Colorado for most of his adult life.

2. At this time, the family farm property consists of (a) one 320 acre parcel of property which serves as the Debtors' residence and contains various different improvements including grain storage facilities and on which various farming activities occur, and (b) one 160 acre parcel of property ("Farm"). The Debtors intend on farming eight quarter-sections of farmland, three of which comprise the Farm as described, and serve as collateral for the objecting creditor, FLB, and five of which are leased by the Debtors.

3. On March 16, 1988 the Debtors filed their initial Motion for Approval of Secured Borrowing Pursuant to 11 U.S.C. § 364(d) and, on April 6, 1988, the Debtors filed their Amended Motion for Approval of Secured Borrowing Pursuant to 11 U.S.C. § 364(d), citing the need to acquire funding for the purchase of "... farming supplies, such as seed, fertilizer, chemicals, fuel, oil, and services such as repair." All items appear to constitute direct and necessary costs of maintaining the farming operation and actual crop production. The Debtors seek to borrow $84,000.00 from Ag Services of America, Inc. and secure those loan funds by the 1988 crop consisting of wheat, corn, beans, and millet.

4. FLB is owed the sum of approximately $281,924.35 at a default interest rate of 14.5% and that claim is secured by the Farm, with an approximate FLB appraised fair market value of $345,000.00, less approximately $55,000.00 attributable to the grain storage facility owned by another party but leased by the Debtors. That estimated value of the Farm establishes a cushion slightly in excess (6%) of the amount of debt. A portion of the Debtors' Farm is anticipated to be sold in the near future. The proceeds of the sale, approximately $110,000.00, will be paid to FLB.

5. CNB is owed the approximate sum of $600,000.00. The claim is secured by Debtors' machinery and equipment, which CNB estimates is valued at $160,000.00. The Debtors' equipment and machinery is in a good state of repair, in good working order, and is maintained according to standards of the secured creditor, CNB. Values of such machinery and equipment generally appear to have stabilized during the past year, but use of machinery can cause values to decline.

6. The Debtors cannot obtain, at this time and under these conditions, any further unsecured extensions of credit and are, thus, relegated to requesting extensions of secured credit pursuant to Section 364(d). Failure to obtain loan funds at this time for crop production will, in all probability, cause the Chapter 11 reorganization to fail.

7. The Cash Flow Planning Form dated April 28, 1988, Debtors' Exhibit No. 1, appears to be a reasonably accurate, reliable, and fair prognostication of income and expenses which can be expected by these Debtors in their farming operation, as acknowledged by Mr. Keller, an FLB loan officer and agent responsible for "special loan problems."

**150**

8. Although Debtors were in default on their debt to FLB, no Receiver was obtained by or for FLB, or was in possession or control of the Debtors' property, at the commencement of the Chapter 11 case.

## OPINION

The positions of the parties are stated briefly as follows:

The *Debtors* maintain that they are entitled to obtain the loan and give a secured interest in the 1988 crop to its new postpetition lender and, in anticipation of FLB's objections, state that: "no party has a lien on the 1988 crop ... because Section 552 cuts off [any lien] on afteracquired property." Debtors cite *In re Hamilton*, 18 B.R. 868 (Bankr.D.Colo.1982) as their principal supporting case law. The Debtors further maintain that although "FLB may claim an interest in rents and profits on ⅜ of the Debtors' farmland ..." such a claim is improper, unperfected, and/or unenforceable and that, in any event, Section 364(d) "...is broad enough to grant priority over these contended interests."

*FLB*, in contrast, claims that it established a "... perfected ... interest in the rents, issues and profits [in the Farm] by filing a Notice Under 11 U.S.C. § 546(b)." FLB maintains, *inter alia*, that as a consequence of its filing under Section 546(b), it has perfected its inchoate lien on rents, issues and profits, and that this security interest transforms itself into a lien on postpetition crops. FLB then argues that the lien is an interest of the FLB that must be adequately protected if and prior to any senior lien being accorded to the lender, Ag Services of America, Inc., under 11 U.S.C. § 364(d).

*CNB* claims, *inter alia*, that its claim of approximately $600,000.00 is secured by all of the machinery and equipment of the Debtors with an estimated fair market value of $160,000.00. This, CNB claims, relegates CNB to the position of an unsecured creditor in the approximate sum of $440,-000.00. CNB further maintains that the machinery and equipment which may be used in the forthcoming planting and crop growing season will deteriorate, as a result of use by the Debtors, and as a consequence CNB is entitled to adequate protection payments in an amount approximately equal to any deterioration or depreciation of the machinery and equipment.

If afforded the opportunity to borrow the funds and grant the secured interest as requested, the Debtors have agreed to and shall perform as follows:

(a) Keep separate records and segregate all funds relative to each of the different parcels of land being farmed, particularly with regard to the three quarters of land which serve as FLB's collateral. All funds expended for each respective parcel, as well as all income derived from each respective parcel, will be accounted for and properly apportioned at all times.

(b) That portion of the $84,000.00 loan which is attributable to the land on which FLB has a secured claim, is approximately $34,000.00. The loan instruments shall specifically differentiate between the loan funds advanced for and used on the FLB collateral land as distinguished from the five quarters of land leased by the Debtors.

(c) The Debtors shall take all steps necessary and appropriate to sell a one-quarter section of land for approximately $110,000.00, the proceeds of which (less costs of sale) shall be paid directly to FLB.

(d) All equipment, machinery and improvements on the subject property shall be maintained by the Debtors in good, operable, and clean condition at all times.

(e) Debtors shall maintain good and sufficient insurance on machinery, equipment, improvements, as well as on crops, at all times during the course of the Chapter 11 case.

## COLORADO NATIONAL BANK

■ CNB's Objection to the Debtors' Motion is not persuasive; indeed it may not be well-founded under the current circumstances. Rather, CNB's argument and

rights go more to the issue of whether or not CNB is entitled to relief from stay pursuant to 11 U.S.C. § 362(d), a matter pending before the Court and to be heard on June 9, 1988. CNB argues, essentially, that the secured borrowing by the Debtors is improper because it will allow the Debtors to use their equipment and machinery which serves as the exclusive collateral on the CNB claim. Use of the collateral, the argument goes, will result in loss of value, depreciation, actual damage, and/or increased risk, all of which leaves CNB not adequately protected.

The allegations, statements in opposition, and other matters raised by CNB *may* be factually sound, but they are not facts which are material to the issue as to whether or not the Debtors can and should be allowed to obtain secured borrowing for purposes of continuing crop production. They are facts material to a relief from stay hearing.

Beyond that, the testimony was unrebutted that the Debtors can conclude their farming operations in calendar year 1988 without the equipment and can obtain "custom farming services" or alternative equipment and/or services for approximately $11,200.00. As a consequence, even if relief from stay is granted to CNB on the machinery and equipment which serves as collateral on its claim, the Debtors appear able to otherwise continue their farming operation and successful crop production.

Still further, certain credible evidence indicates that the value of the machinery and equipment has now stabilized and, under certain circumstances, might increase in value rather than decrease over the course of the next year or so. For the reasons set forth above and since Debtors' equipment is acknowledged by the creditor to be in good repair and good working order, and it is insured in an amount sufficient to protect CNB's interest, the Court will deny CNB's Objection to the Debtors' Motion.

### FEDERAL LAND BANK

FLB argues strenuously that its position, as previously set forth, is supported by *In re Colter*, 46 B.R. 510 (Bankr. D.Colo.1984) and *In re Morning Star Ranch Resorts*, 64 B.R. 818 (Bankr.D.Colo. 1986). Moreover, FLB places great emphasis and reliance on an unreported decision of Judge Matheson, *In re William Stroh*, Bankruptcy Case No. 88–B–377–E. FLB's position and reliance on *Stroh*, succinctly stated in its brief, is as follows:

> In the most recent case, *In re William Stroh*, Bankruptcy Case No. 88–B–377–E, Judge Matheson entered an Order dated March 17, 1988 finding that the lien of The Federal Land Bank under its Mortgage is entitled to protection of its 'rents, issues, and profits', and that the debtor may not sell, use, lease, or otherwise dispose of the cash collateral (including *all* economic benefits from the property) without a proper showing under 11 U.S.C. § 363. A copy of the transcript of Judge Matheson's decision is attached to [FLB's] brief. The same would apply to the adequate protection required under 11 U.S.C. § 364(d) if a super priority lien is granted. Further, the burden of showing adequate protection is on the Debtor. See 11 U.S.C. § 363(4).

FLB argues that:

> Crops growing at the time an inchoate security interest is perfected are covered by the mortgage, rents, issues, and profits clause. [Cases cited.] Therefore, FLB's security interest in the postpetition crops is a valid, recognizable property right. That right must be adequately protected under 11 U.S.C. § 364 if a super priority lien is granted on those crops.

For different reasons, any one of which might stand alone in rejecting the FLB's position, this Court believes that the Debtors are entitled, under these circumstances, to the requested secured borrowing. First, this Court believes that FLB's reliance on *Stroh* in this case is misplaced. In the *Stroh* case, Judge Matheson made specific and repeated comment which distinguished the issues being decided in *Stroh* from those issues before this Court in this case. Judge Matheson stated:

What we are not concerned with today is the question of whether the debtors can further encumber the property for an operating loan for this year's operations. (March 17, 1988 transcript, page two.) We don't have the borrowing application here. (Transcript, pages four and five.) But, again, the application to borrow, which I understand has been filed, is not the application that we set for hearing today. ... And I do think it's unfortunate that it got set this way as opposed to being set together with the application to approve post-petition financing, because the matter should have been heard together. [The "matter" is a determination of FLB's "interests in the cash collateral."] (Transcript, page six.) What that leaves us with as far as today's hearing is concerned, I think, is solely the Court's finding that the Land Bank does have the interest in the rents and profits. (Transcript, page six.)

Beyond Judge Matheson's efforts to limit and distinguish the *Stroh* case, it is this Court's view that he did not, as maintained by FLB, also find that FLB's lien, under its mortgage, is entitled to protection of its "rents, issues and profits," to the extent that the "... debtor may not sell use, lease, or otherwise dispose of the cash collateral (including *all* economic benefits from the property)." (Emphasis supplied by FLB.) FLB appears to argue here that as a perfected lien creditor, it is entitled to *all* economic benefits of its collateral interest in the Debtors' Farm property, which benefits include *crops planted, cultivated, and harvested post-petition.* FLB maintains such crops cannot be used or sold by the Debtors, or encumbered by Ag Services of America, Inc., without first affording to FLB adequate protection on the 1988 crops.

This Court does not agree with that view. While FLB might have a lien on rents and profits, it does not have one on new crops.

Rents and profits are not crops. They are different, and may be treated as such.

This Court does not believe that the *Stroh* decision is as all-encompassing, comprehensive and conclusive on the issues for which the FLB suggests that it is. Judge Matheson concluded, only, that under the facts in that case his decision "... is solely the Court's finding that the Land Bank does have the interest in the rents and profits."

Second, the principal question posited by the FLB is whether or not the inchoate lien on "rents, issues and profits," when perfected postpetition pursuant to the filing of a Section 546(b) notice, constitutes the perfection of a valid and enforceable claim against a farmer's crops. This Court believes that it is indeed arguable that perfection of that inchoate lien may apply to and be enforceable against crops in the ground at the time of filing the petition, or to perennial crops. *See, Matter of Beck*, 61 B.R. 671 (Bankr.D.Neb.1985); *In re Crouch*, 51 B.R. 331 (Bankr.D.Or.1985). However, it is quite doubtful that it applies to crops planted postpetition using postpetition income or borrowed funds which are not cash collateral.[1] The perfected right of FLB might well apply to the *profits* from any sale of the 1988 crop, but not to the crop, itself.[2] This proposition is, however, also subject to some dispute. *In re Lorenz*, 57 B.R. 734, 736 (Bankr.N.D.Ill.1986).

Third, 11 U.S.C. § 552 provides, in pertinent part, as follows:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case;

(b) Except ... if the debtor [and] an entity entered into a security agree-

---

**1.** The unrebutted testimony before the Court in this case is that wheat and corn seed was acquired by the Debtors and planted, postpetition, and that the full crop production process for wheat, corn, beans, and millet will be conducted postpetition with postpetition funds.

**2.** The important issue of the Debtors' right to receive and use government payments and/or other income which can be deemed cash collateral is not the issue raised or decided here. *See, In re Harvie*, 84 B.R. 197 (Bankr.D.Colo.1988); *In re Clark*, 82 B.R. 131 (Bankr.D.Colo.1987).

ment before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Based on Section 552, the Court concludes that crops have not been *expressly* made an exception to the rule that after-acquired property is free of prepetition lien claims. Congress could easily have specifically allowed crops to be excluded from the impact of Section 552(a) if it wanted to do so. It did not do so. This Court simply believes that Section 552(a) is intended to and constitutes a termination of a prepetition lien creditor's claim in new, *postpetition crops. In re Sheehan*, 38 B.R. 859, 863 (Bankr.D.S.D.1984). *See, In re Newton*, 64 B.R. 790 (Bankr.C.D.Ill.1986); *In re Lorenz, supra.*

Fourth and perhaps most persuasive, however, is this Court's reading and reliance on *In re Hamilton*, 18 B.R. 868 (Bankr.D.Colo.1982). In *Hamilton*, Judge McGrath, in circumstances similar to this case, correctly concluded that "... Section 552(a) precludes the fixing of a lien resulting from a prepetition security agreement on property acquired after the filing of the petition" and that it "... seems clear that this is exactly the effect which Congress intended." Judge McGrath ruled that Section 552(b) is *not* applicable to new crops and thus they are *not* excepted from the general rule that:

**3.** As a bona fide purchaser for value or as a hypothetical lien creditor, the debtor-in-possession might, as of the date of filing the petition, acquire rights (title or lien) prior to and superior to the secured creditor and effect a "severance" of the chattel, cutting off the unperfected

[I]f a security agreement is entered into before the commencement of the case, then property that the estate acquires is not subject to the security interest created by a provision in the security agreement extending the security interest to after-acquired property.... Senate Report No. 95–989, 95th Cong., 2nd Sess. (1978) 91, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5877.

*Id.* at 871.

In this Court's opinion, the result is almost inescapable: that *new* crops are free of the prepetition secured creditor's claim. *See, In re J. Catton Farms*, 779 F.2d 1242, 1246 (7th Cir.1985).

Fifth, crops, under state case law and the Uniform Commercial Code, are often treated as chattel and as property *severed* from the land. By definition, by case law, and by practice, then, crops are sometimes deemed personal property, separate and distinct from the land. For example, the UCC treats growing crops as a "good." (C.R.S. § 4–9–105(f)) State law accords to growing crops the status of a chattel which may be mortgaged and/or conveyed separate and apart from the land. *Wood v. Wood*, 116 Colo. 593, 183 P.2d 889 (1947); *Tolland Co. v. First State Bank of Keenesburg*, 95 Colo. 321, 35 P.2d 867 (1934).

This treatment of crops under state law may give rise to the argument that unless the creditor perfected its interest and rights in a crop (i.e., *personal property*) and obtained appointment of a receiver before the filing of a petition in Chapter 11, then the creditor's rights to the separate personal property, or "severed" crops, may be cut off by the strong arm powers of the debtor pursuant to 11 U.S.C. § 544.[3]

Sixth, the Court is given certain limited discretion to allow "... proceeds, product ... rents or profits of such property ..." to flow to the Debtors rather than to the creditor, if equities of the case so warrant. The equities in this particular case, and

inchoate lien in crops, through the rents and profits provision of a deed of trust. This concept and observation is too brief, too inadequately researched, and too incomplete in discussion to warrant substantial reliance here.

under these circumstances, justify allowing the Debtors to grant the lender a first, prior and superior lien in the 1988 crops, and not accord to FLB lien rights or claims which would interfere, impede, and jeopardize the ongoing farm operations and/or jeopardize the production of the 1988 crop and the resulting reorganization effort of these Debtors.

IT IS THEREFORE ORDERED that (1) the Debtors' Amended Motion for Approval of Secured Borrowing is hereby approved to allow Debtors to borrow the sum of $84,000.00 from, and grant to the lender, Ag Services of America, Inc., a first lien on Debtors' 1988 postpetition crops, pursuant to 11 U.S.C. § 364(d); that (2) the CNB Objection to Debtors' Motion is hereby denied; that (3) the FLB is not entitled, and Debtors are not required, to first grant adequate protection to the FLB on its claim of a lien, or lien rights, on Debtors' postpetition crops; that (4) Debtors shall account for all proceeds of sale and profits derived from sale, or other disposition, of its crops on and from FLB's collateral three quarters of Debtors' Farm and shall segregate all profits derived from such sale or other disposition of said crops pending determination of FLB's rights or interest in the Debtors' profits resulting from the 1988 crop.