**In the Matter of Larry KAIN, a/k/a Larry Richard Kain, and Larry R. Kain and Irma Kain, a/k/a Irma L. Kain, Debtors.**

**Bankruptcy No. GG 86–01111.**

United States Bankruptcy Court, W.D. Michigan.

May 13, 1988.

Paul B. Newman, Newaygo, Mich., on behalf of Larry Kain and Irma Kain, debtors.

Edith Landman, Asst. U.S. Atty., on behalf of the Dept. of Agriculture Farmers Home Admin. Grand Rapids, Mich.

## OPINION REGARDING APPLICATION OF ADEQUATE PROTECTION PAYMENTS AND APPROPRIATE PRESENT VALUE RATE UNDER DEBTORS' CHAPTER 11 PLAN

JAMES D. GREGG, Bankruptcy Judge.

### ISSUES

This case presents two interesting issues raised in connection with the confirmation of the Debtors' proposed Chapter 11 plan.

First, with respect to certain adequate protection payments made by the Debtors after filing and prior to confirmation, to what obligation, if any, should such payments be applied? The Debtors assert that the adequate protection payments should be applied only toward their outstanding secured indebtedness owed to the creditor with respect to certain livestock notes. The secured creditor opposes such an application and implicitly asserts that the payments should be applied toward the livestock notes, even if *not* secured, or toward so-called lost opportunity costs. Both parties refer the court to *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), but neither party is certain what that case mandates pursuant to the existing facts in this matter.

Second, what is the appropriate present value rate, i.e. interest rate, to be provided with respect to the creditor's allowed secured claim? The Debtors argue that the specific contract interest rates set forth in

certain promissory notes should govern, relying upon *Cardinal Fed. Sav. and Loan Ass'n v. Colegrove (In re Colegrove)*, 771 F.2d 119 (6th Cir.1985). The secured creditor asserts that current market interest rates should be utilized relying upon *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982).

## FACTS

Larry and Irma Kain, husband and wife, referred to as the "Debtors", filed their voluntary petition for relief under Chapter 11 of the Bankruptcy Code[1] on April 18, 1986. Mr. Kain is a crop farmer and livestock producer who also owns and is employed by Farm Feeds and Farm By-Products, Inc.

The United States of America, Department of Agriculture, Farmers Home Administration, referred to as the "FmHA", is a creditor of the Debtors which holds a prepetition security interest in all of the Debtors' crops, livestock and equipment. The FmHA's security interest in the Debtors' collateral was properly perfected by the filing of various financing statements with the Montcalm County Register of Deeds, as required by the Uniform Commercial Code as adopted in the State of Michigan. The FmHA also was granted five mortgages with regard to the Debtors' real property. Those mortgages have been duly recorded and perfected as required by Michigan law.[2]

On June 26, 1986, the FmHA filed its proof of claim in this case. The amount of that claim was $411,119.06 which is comprised of $279,537.76 in principal indebtedness and $131,581.38 in accrued unpaid prepetition interest.[3]

On December 10, 1987, the Debtors filed their Chapter 11 Plan of Reorganization and their Disclosure Statement. On January 19, 1988, the Debtors filed their First Amended Disclosure Statement which was approved by this court. A confirmation hearing was originally scheduled to take place on March 15, 1988.

Objections to the Debtors' plan were filed by the FmHA; the Federal Land Bank of St. Paul; and the United States of America, Internal Revenue Service. At an adjourned confirmation hearing on April 12, 1988, nearly all objections to confirmation were resolved or withdrawn. The only remaining issues relate to the treatment of the FmHA's allowed secured claim and the application of periodic payments previously received by the FmHA.[4] The Debtors, the FmHA, and other interested parties have agreed that the Chapter 11 plan of the Debtors might be confirmed subject to this court's determination of the outstanding legal issues.

Between July, 1977, and June, 1982, the Debtors executed and delivered nine promissory notes to the FmHA in return for loans made and funds advanced. The various note obligations are set forth in the following summary:[5]

1. The Bankruptcy Code, as amended, is set forth in 11 U.S.C. §§ 101–1330.

2. The parties have stipulated to the authenticity of all the notes, the security interest, the mortgages and all other documents attached to the FmHA claim. Although not formally marked and admitted into evidence, the parties have further stipulated that the court may review and rely upon all pleadings in its file in rendering this opinion.

3. In the FmHA claim, the court notes that there is a minor discrepancy because the principal plus interest does not equal the total amount claimed.

4. At the adjourned hearing, the court determined that all confirmation requirements set forth in 11 U.S.C. § 1129 had been met except for those relating to the remaining issues.

5. The Debtors and the FmHA stipulated to the facts set forth in the summary.

6. The types of loans are abbreviated as follows:
OL designates an operating loan;
OL/EM designates an operating emergency loan;
OL/EE designates an operating economic emergency loan;
RE/EM designates a real estate emergency loan;
RE/EE designates a real estate economic emergency loan; and
RE/SW designates a real estate soil and water loan.

| Date of Note | Amount of Note | Type of Note[6] | Secured By[7] | Principal Owed as of 4–18–86 | Contract Interest Rate[8] | Accrued Interest as of 4–18–86 | Maturity Date |
|---|---|---|---|---|---|---|---|
| 7–27–77 | $39,750 | OL | Chattels | $13,796.13 | 8% | $ 536.32 | 7–27–84 |
| 5–3–78 | 77,240 | RE/EM | R. est./ Chattels | 65,045.47 | 3% | 11,200.29 | 5–3–85 |
| 5–3–78 | 17,000 | RE/EM | R. est. | 16,270.76 | 8% | 8,035.81 | 5–3–2018 |
| 5–26–78 | 32,500 | RE/EM | R. est. | 30,942.22 | 8% | 15,707.08 | 5–26–2018 |
| 1–25–80 | 40,000 | RE/EE | R. est./ Chattels | 40,000.00 | 10.5% | 26,155.07 | 1–25–87 |
| 7–2–80 | 21,500 | OL/EM | Chattels | 11,844.31 | 13.5% | 7,569.97 | 7–2–87 |
| 8–8–80 | 23,000 | RE/SW | R. est. | 23,000.00 | 11% | 14,136.50 | 8–8–95 |
| 5–11–81 | 87,100 | Ol/EE | Chattels | 35,396.27 | 14% | 18,260.60 | 5–11–88 |
| 6–14–82 | 36,000 | RE/EM | R. est./ Chattels | 36,000.00 | 16% | 22,140.50 | 6–14–83 |

The parties stipulated that the notes listed above were not accelerated by the FmHA. However, the first two notes listed above matured before the filing of the petition. Based upon the above summary, the principal indebtedness owed by the Debtors to the FmHA was $272,295.16, and the total accrued interest was $123,742.14; as of the filing date, the total indebtedness was $396,037.30.[9]

The Debtors and the FmHA stipulated that the current market value interest rates, for plan confirmation purposes, are 9% per annum with respect to indebtedness secured by chattels and 9½% per annum with respect to indebtedness secured by real property. The parties agreed that the stipulated market interest rates will remain binding notwithstanding any possible increase or decrease in the rates pending the rendering of this court's opinion. The parties further stipulated that the amortization periods now utilized by the FmHA are generally seven years for loans secured by chattels and forty years for loans secured by real estate.

On June 12, 1986, the Debtors filed their Motion for Release of Proceeds of Collateral. The Debtors asserted they needed to utilize the livestock sales proceeds for feed, fuel and utility expenses. In their motion, the Debtors offered to pay an undisclosed portion of the livestock sales proceeds to adequately protect the FmHA "until confirmation or until payments total $23,035.00, plus postpetition interest, whichever occurs first." [10]

On or about July 7, 1986, the Debtors and the FmHA entered into a Stipulation to Release Proceeds of the Sale of Collateral and for Adequate Protection Payments. Because the stipulation is relevant to this court's determination regarding the application of the payments, the language of the stipulation is set forth below:

NOW COME Debtors herein, by counsel, and the Farmers Home Administration, by the United States Attorney for the Western District of Michigan, who stipulate and agree as follows:

1. That at the time of the filing of the Petition in the present proceedings, Debt-

7. "Chattels" include crops, equipment and livestock, whether owned at the time of the loan advance or after acquired; "R. est." designates real property.

8. All interest rates listed are on a per annum interest rate basis. With regard to the notes dated January 25, 1980, July 2, 1980, August 8, 1980, May 11, 1981, and June 14, 1982, the FmHA is permitted to change the rate of interest, not more than quarterly, if the applicable note is for a Limited Resource loan. The parties have stipulated that none of the loans are of this type; therefore all interest rates in the FmHA notes are fixed nonvariable rates.

9. The total indebtedness disclosed by the summary is $15,081.76 less than the amount of the FmHA's proof of claim. The court, based upon the record before it, is unable to reconcile this discrepancy. However, because the facts contained in the summary were stipulated to by the parties after the filing of the FmHA's claim, the court will rely upon the indebtedness amounts set forth in the summary.

10. Although this pleading is somewhat unclear, the court believes that the motion was actually in the nature of a motion to use cash collateral. 11 U.S.C. § 363(c)(2)(B). The proceeds from livestock sales constitute cash collateral. 11 U.S.C. 363(a).

ors were indebted to the FHA, which indebtedness was, at least partially, if not fully secured by liens on real estate, farm equipment and livestock.

2. That the operation of Debtors consists primarily of the raising of hogs, which operation necessarily requires that, except for breeding stock, as animals reach market weight, or as breeding stock becomes no longer valuable as such, animals are sent to market.

3. That Debtors need at least a portion of all post petition sales in order to continue operations, and to purchase and grow feed for the herd.

IT IS THEREFORE SPECIFICALLY STIPULATED AND AGREED that of all post petition sales of livestock, Debtors shall retain 75% of the proceeds from the sale thereof to be used for any and all operating expenses, subject only to the limitations contained in the Definitive Order, the Debtors hereby having specific permission of the secured party to use the same for the aforesaid purposes.

IT IS FURTHER STIPULATED AND AGREED that the remaining 25% of the proceeds from the sale of all livestock, post petition, shall be paid to the FHA, as adequate protection.

IT IS FURTHER STIPULATED AND AGREED that the FHA shall apply the monies received pursuant to this Stipulation [*to the secured portion of the indebtedness to the FHA in the event the FHA is not fully secured, and applied*] to the specific notes for which security in

livestock has been previously given to the FHA by the Debtors.

IT IS FURTHER STIPULATED AND AGREED that the question of whether or not the FHA is less than fully secured, and if so, the amount of the secured portion of the debt shall be held in abeyance, to be resolved at a later time.[11]

Pursuant to an attendant adequate protection order, the Debtors made periodic payments to the FmHA as follows:[12]

| Date | Amount Paid |
|------|------------|
| 7-7-86 | $1,054.06 |
| 8-12-86 | 1,272.55 |
| 8-20-86 | 1,054.06 |
| 9-3-86 | 675.00 |
| 9-23-86 | 1,450.31 |
| 11-6-86 | 1,076.61 |
| 11-25-86 | 252.16 |
| 1-21-87 | 398.70 |
| 4-3-87 | 2,913.71 |
| 4-30-87 | 600.00 |
| 7-14-86 | 287.83 . |
| 7-15-87 | 766.23 |
| 8-18-87 | 1,130.46 |
| 8-26-87 | 454.08 |
| 12-2-87 | 1,540.75 |
| TOTAL PAYMENTS: | $14,956.51[13] |

On or about May 1, 1987, the Debtors sold certain surplus equipment which was subject to the FmHA's security interest. The Debtors received $1,767.97 from the sale and those proceeds were remitted to the FmHA.[14]

The parties stipulated the values of the various categories of collateral, which are subject to the FmHA's mortgages and security interest, as of certain dates[15] are as follows:

11. The underlined language within the brackets above was in the original stipulation but crossed out and the change initialed by the parties' respective counsel prior to filing of the stipulation with the court.

12. Most of the payments summarized below are set forth in the Debtors' First Amended Disclosure Statement. The parties stipulated that the dates and amounts of the payments in that pleading are accurate. The last three payments were not included in the amended disclosure statement. However, at the valuation hearing, the parties stipulated that those dates and payment amounts are also accurate. Although one payment is listed as having been made on July 14, 1986, the court believes this is a typographical error and the payment was actually made on July 14, 1987.

13. In the event any additional payments are made by the Debtors to the FmHA prior to confirmation, the parties stipulated that those payments shall be applied, as determined by this court, in the same manner as the payments previously made.

14. The equipment sale proceeds payment is not included· in the above summary of payments.

15. The dates utilized are: the date the petition was filed, April 18, 1986; the date of the order approving the adequate protection stipulation, July 14, 1986; and the date of the valuation hearing regarding FmHA's collateral, March 3, 1988.

| Type of Collateral[16] | Value on 4-18-86 | Value on 7-14-86 | Value on 3-3-88 |
|---|---|---|---|
| Real property | $ 98,100.00 | $ 95,200.00 | $ 95,200.00 |
| Equipment | 13,350.00 | 14,069.97 | 12,302.00 |
| Livestock | 23,035.00 | 23,125.00 | 23,125.00 |
| TOTAL VALUE: | $134,485.00 | $132,394.97 | $130,627.00 |

Based upon the above values, between the date of filing of the petition and the date of the valuation hearing: the real estate value decreased by $2,900; the equipment value decreased by $1,048.00; and the livestock value increased by $90.00. Between the date of the order approving the adequate protection stipulation and the date of the valuation hearing: the real estate value remained constant; the equipment value decreased by $1,767.97; and the livestock value remained constant.[17] After the valuation hearing, the parties stipulated in writing that the livestock value is $30,762.00. The livestock value has increased from the date of the adequate protection order to the present by $7,637.00. Therefore, the total value of the FmHA's collateral is now $138,264.00.

**16.** Although the security agreement granted the FmHA an interest in the Debtors' crops, the FmHA has not claimed an interest in crops in its proof of claim or in connection with this case. Therefore, no valuation of the Debtors' interest in crops is necessary.

**17.** With respect to the equipment values, the court recognizes that a portion of the equipment was sold postpetition; and the proceeds, in an amount of $1,767.97, were remitted to the FmHA. This sale explains the decrease in the equipment value between July 14, 1986 and March 3, 1988. The court also finds that the values of the various categories of collateral were the same on the date of the adequate protection stipulation and the date that the attendant order was signed. The court believes it reasonable to find the collateral values did not change during that brief period.

**18.** 11 U.S.C. § 363(c)(1) states:
If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

## DISCUSSION AND CONCLUSIONS

### Application of Adequate Protection Payments

There is no provision in the Bankruptcy Code which mandates how adequate protection payments shall be applied. To determine how the payments made by the Debtors to the FmHA shall be applied, this court must consider bankruptcy statutes, the concept and purposes of adequate protection, and the parties' agreement respecting application of the payments.

When a chapter 11 debtor-in-possession is authorized to operate its business, it may use property of the estate in the ordinary course of business.[18] However, a debtor-in-possession or trustee is *absolutely* prohibited from using cash collateral unless a secured creditor with an interest in such collateral consents or unless the court authorizes the use of cash collateral.[19]

In the ordinary course of business, the Debtors sold livestock and received proceeds from the sales. The FmHA's securi-

**In a Chapter 11 case, a debtor-in-possession has most of the rights, powers and duties of a trustee. 11 U.S.C. § 1107(a). Unless the court orders to the contrary, a debtor-in-possession may operate its business. 11 U.S.C. § 1108. Pursuant to a Definitive Order dated April 25, 1986, the Debtors were authorized to operate their business subject to certain specified conditions.**

**19.** 11 U.S.C. § 363(a) defines "cash collateral" as:
cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.
11 U.S.C. § 363(c)(2) states in its entirety:
The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
  (A) each entity that has an interest in such cash collateral consents; or
  (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

512

ty interest in the noncash collateral livestock attached to the cash collateral proceeds. The FmHA's security interest also attached to the postpetition offspring of the livestock.[20] After the filing of the petition, the FmHA had an interest in (1) the Debtors' real estate which constitutes noncash collateral; (2) the Debtors' equipment which constitutes noncash collateral; (3) the Debtors' livestock and its offspring which constitutes noncash collateral; and (4) proceeds from sales of livestock and offspring which constitutes cash collateral.

■ During the pendency of this case, the FmHA never requested any adequate protection with regard to its noncash collateral. 11 U.S.C. § 363(e). Because the FmHA did not request that its interest in noncash collateral be adequately protected, it is not entitled to such protection. Colloquially expressed, if you don't ask for it, you won't get it. *In re Hinckley,* 40 B.R. 679, 681–82 (Bkrtcy.D. Utah 1984) (creditor first became entitled to adequate protection on depreciating vehicle when informal request was made at § 341 meeting); *In re Haiflich,* 63 B.R. 314, 317 (Bkrtcy.N.D.Ind. 1986) (creditor entitled to adequate protection from date relief from stay motion filed); *accord, In re Wilson,* 70 B.R. 46, 48 (Bkrtcy.N.D.Ind.1987); see also 3 *Collier on Bankruptcy* ¶ 506.04[2] at 506–36 to –37 (15th ed.1988).

With regard to its interest in cash collateral proceeds from livestock sales, the FmHA need not request adequate protection. The Debtors were absolutely prohibited from using those proceeds unless the FmHA consented or unless the court authorized the use of the proceeds conditioned upon a finding that the FmHA was adequately protected. 11 U.S.C. § 363(c)(2). Because of this prohibition, the Debtors filed their Motion for Release of Proceeds of Collateral. The FmHA then consented to the use of the livestock proceeds pursuant to the stipulation by the parties. The stipulation must be construed consonantly with statutory principles and governing case law.

In the stipulation, the most significant provision requires the FmHA to apply the payments received "to the specific notes for which security in livestock has been previously given to the [FmHA] by the Debtors."[21] The court believes that another highly relevant condition is that the Debtors were authorized to retain and use 75% of the cash collateral proceeds and the FmHA would be paid the remaining 25% balance. Why did the parties agree to this division of the proceeds? Were the payments intended to be in compensation of the FmHA's so-called lost opportunity costs? Or, were the payments intended to accomplish some other purpose?[22]

The FmHA livestock collateral and its postpetition offspring must be fed, cared

20. 11 U.S.C. § 552(b) states:
Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor [and] an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.
The FmHA's security interest regarding equipment covers all after-acquired equipment "to-

gether with all replacements, substitutions, additions and accessions thereto." The FmHA's security interest regarding livestock covers all after-acquired livestock "together with all increases, replacements, substitutions and additions thereto."

21. *See* text *supra* and note 11 for the language of the stipulation in its entirety.

22. The major difficulty in answering these questions is that the parties did not expressly address these questions during argument or in the stipulated facts. The court must therefore rely upon the record before it, however sparse, to determine the intent of the parties. The court will presume the respective parties. and their counsel were aware of relevant provisions of the Bankruptcy Code and applicable case law when the stipulation was signed.

for, raised, fattened and eventually marketed to enable the livestock to be converted into the cash collateral proceeds. Is the FmHA entitled to the full amount of the gross proceeds from the sales of the livestock? Under the "equities of the case" exception in 11 U.S.C. § 552(b), or pursuant to the surcharge principle in 11 U.S.C. § 506(c), the FmHA may not be entitled to the total gross proceeds.[23] The gross livestock proceeds subject to the FmHA security interest should be reduced by reasonable postpetition expenses validly and demonstrably paid or incurred by the Debtors to raise, preserve, enhance or market the livestock. *In the Matter of Beck,* 61 B.R. 671, 674 (Bkrtcy.D.Neb.1985). ("equities of the case" rule of § 552(b) applied to permit debtors to share jointly with creditors in postpetition proceeds); *In the Matter of Vanasdale,* 64 B.R. 92 (Bkrtcy.N.D. Ohio 1986); *In re Hardage,* 69 B.R. 681, 685 (Bkrtcy.N.D.Tex.1987), *rev'd* and *remanded* on different grounds *sub nom. Hardage v. Herring Nat'l Bank,* 837 F.2d 1319 (5th Cir.1988) (disagreeing with *Vanasdale* with regard to recovery of prepetition expenses); *Randall v. Bank of Viola (In re Randall),* 58 B.R. 289 (Bkrtcy.C.D.Ill.1986); *In re Hamilton,* 18 B.R. 868 (Bkrtcy.D.Colo. 1982). While these cases all involve crops, the legal principles considered in the cases also apply to livestock collateral.

This court has also reviewed and is cognizant of *In the Matter of Combined Crofts Corp.,* 54 B.R. 294 (Bkrtcy.W.D.Wisc.1985), which involved a hog-raising business. In that Chapter 11 case, after the filing of the petition, the debtor incurred continuing losses and was unable to file a viable plan of reorganization. In *Combined Crofts,* Judge Martin denied the debtor's request to surcharge a secured creditor's cash collateral proceeds because the debtor was unable to prove the costs expended were reasonable and provided *direct benefit* to the secured creditor. Had the debtor proven the elements required by 11 U.S.C.

§ 506(c), this court believes the debtor in *Combined Crofts* would have been permitted to use a portion of the cash collateral proceeds.

Rather than litigating the Debtors' motion to use the proceeds, the parties settled upon a formula whereby 75% of the proceeds would be used to pay postpetition expenses which benefitted FmHA's livestock collateral. It was explicitly agreed that the balance of the proceeds would be applied to the livestock notes. Because the FmHA did not request any adequate protection regarding real estate or equipment, and the stipulation is silent regarding protection of noncash collateral, the payments made were not intended to protect the FmHA's interest in any noncash collateral. The FmHA is not entitled to receive protection regarding its interest in real estate or equipment. The payments only afforded protection with respect to the FmHA's interest in livestock.

In a classic sense, adequate protection payments should be applied to compensate a secured creditor for any diminution in the value of collateral as a result of use, depreciation, destruction or other caused reduction in value. 11 U.S.C. § 361; 11 U.S.C. § 363(e); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 793 F.2d 1380, 1412 n. 57 (5th Cir.1986) (collecting supporting cases), *aff'd, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),* 25 B.R. 987, 994 (Bkrtcy.D.Utah 1982) ("adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim."). In this case, the value of the FmHA's interest in the Debtors' livestock has not diminished after the time the stipulation was executed. None of the payments made by the Debtors are necessary

---

**23.** 11 U.S.C. § 552(b) is set forth in note 20 *supra.* 11 U.S.C. § 506(c) states "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

to compensate the FmHA for a diminution of livestock collateral. Therefore, in hindsight, classic adequate protection coverage was not necessary in this case.

Pursuant to the record in this case, there is no indication whatsoever that payments made were intended to compensate the FmHA for any asserted lost opportunity costs. Certain courts previously allowed such payments to compensate an undersecured creditor for the delay occasioned by the automatic stay in enforcing its rights against the collateral. *Crocker Nat'l Bank v. American Mariner Indus., Inc. (In re American Mariner Indus., Inc.),* 734 F.2d 426 (9th Cir.1984); *Grundy Nat'l Bank v. Tandem Mining Corp.,* 754 F.2d 1436 (4th Cir.1985); *In re Briggs Transp. Co.,* 780 F.2d 1339 (8th Cir.1985) (undersecured creditor not entitled to lost opportunity costs as a matter of law but court might award such costs based upon given facts and circumstances). It is now settled that undersecured creditors are not entitled to lost opportunity costs. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* — U.S. —, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Because the parties in this case did not contemplate that the payments would be applied to compensate for lost opportunity costs, the payments may not be applied in such a manner.[24]

This court believes that the Debtors' payments to the FmHA must be applied to the FmHA's allowed claim. Since the FmHA is undersecured, should the payments be applied to its *secured* claim or its *unsecured* claim?[25]

The application of adequate protection payments was considered in *In re Rich Int'l Airways, Inc.,* 50 B.R. 17 (Bkrtcy.S.D. Fla.1985). In that Chapter 11 case, the debtor paid a creditor periodic payments totaling $148,449.73. After a dispute arose relating to the debtor's obligations under its amended confirmed plan, the court determined that the adequate protection payments should be credited against the principal balance of the creditor's indebtedness. That court reasoned that a creditor should not be paid more "than the amount owed and agreed upon pre-petition" and "should not receive more than the benefit of his bargain."[26] *Id.* at 18.

A more analogous situation to this instant case is addressed in *In re Canaveral Seafoods, Inc.,* 79 B.R. 57 (Bkrtcy.M.D.Fla. 1987). One of the issues discussed was the proper application of adequate protection payments. The creditor's interest was limited to certain equipment, and the creditor was not undersecured. During the pendency of that case, the creditor received six payments of $3,000 each. The creditor argued that those payments were in compensation for lost opportunity costs. In *Canaveral,* Judge Proctor rejected that argument and held "the $80,000 value of [the creditor's] claim will be reduced by the amount of adequate protection payments received by [the creditor], less five percent (5%) which will be applied to sales and/or use tax." *Id.* at 59.

The *Canaveral* case is well reasoned and persuasive in accordance with its facts. In *Canaveral,* the undersecured creditor apparently was paid from the debtor's post-petition income which, if not utilized to pay that undersecured creditor, would have been available to benefit other creditors. The payments were applied to partially satisfy the *secured* portion of the claim and also reduce the amount of the entire claim. In this case, the FmHA received payments from the proceeds of its livestock collateral. Therefore, this court must consider a

---

**24.** Although each of the parties argued whether *Timbers* should be applied retrospectively, this court need not decide if lost opportunity cost payments should be permitted pursuant to a pre-*Timbers* agreement.

**25.** The FmHA's total allowed claim is in the amount of $396,037.30. Based upon 11 U.S.C. § 506(a), a portion of the allowed claim will be secured and the balance unsecured. *See* note 29 *infra.*

**26.** It is not possible to readily ascertain whether the creditor in the *Rich* case was fully secured or partially secured. That court did not discuss whether the application of the adequate protection payments was to the secured portion, or unsecured portion if any, of the creditor's claim.

different factual situation than that addressed by the *Canaveral* case.

Because the FmHA received payments only from the proceeds of its collateral, it did not receive any windfall to the detriment of other creditors. If the FmHA's share of the gross proceeds had not been paid to it shortly after various livestock sales were made, the FmHA would have an interest in the cash collateral proceeds deposited in the Debtors' bank account. *Cf. In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 826 (Bkrtcy.S.D.N.Y.1982) (recognizing that value of property subject of secured claim was increasing by unspent rental income accumulating in accounts). The FmHA's secured claim with regard to the livestock collateral is now $30,762.00.[27] Absent receiving the payments from the Debtors, the FmHA's secured portion of its claim would have been increased by its share of the proceeds retained by the Debtors, i.e., $14,956.51; if this had occurred, the FmHA's unsecured portion of its claim would have been reduced by the same amount. 11 U.S.C. § 506(a).

■ When an *undersecured* creditor receives proceeds from the sale of its collateral during the pendency of a case, whether or not denominated as adequate protection payments, the net effect is that such payments shall be credited to reduce its total principal indebtedness. Therefore, the unsecured portion of the creditor's claim will be reduced by the total amount

of the proceeds received and the secured portion of the creditor's claim will be determined *exclusive* of such payments.[28]

Finally, the court is cognizant of a corollary principle to the fair and equitable test contained in 11 U.S.C. § 1129(b). No creditor shall receive more than 100% of its allowed claim under a Chapter 11 plan. 5 *Collier on Bankruptcy* ¶ 1129.03[4][g], at 1129–74 to –75 (15th ed.1988). The court's analysis is consistent with this corollary principle. The analysis is also consonant with the parties' agreement that the payments would be applied to the specific livestock notes.

The payments denominated as "adequate protection" by the parties in this case need not be applied to compensate for any diminution in the value of the collateral protected, there being no such diminution. The payments shall not be applied to any socalled lost opportunity costs because the FmHA is not entitled to such costs. The payments must be applied to reduce the total allowed claim of the FmHA. The secured portions of that reduced claim will then be determined in accordance with the valuation of the collateral as of the plan confirmation date.[29]

*Appropriate Present Value Rate Respecting Treatment of FmHA's Secured Indebtedness*

The FmHA is a creditor which now holds an allowed secured claim in the amount of

---

27. *See* text *supra.*

28. The secured portion of the claim will be determined by the value of the remaining collateral as of the effective date of the plan. 11 U.S.C. § 1129(b)(2)(A)(i)(II). The court believes this result is consistent with the *Canaveral* case; the payments were *not proceeds* of the debtor's collateral and the payments therefore reduced the total principal indebtedness and also reduced the secured portion of the claim.

29. The secured and unsecured portion of the FmHA claim, for confirmation purposes, is calculated as follows:

| | |
|---|---|
| Total claim per stipulated facts: | $396,037.30 |
| Less livestock proceeds received: | 14,956.51 |
| Balance: | $381,080.79 |
| Less equipment proceeds received: | 1,767.97 |

| | |
|---|---|
| Balance: | $379,312.82 |
| Amount of secured portion of claim: | 138,264.00 |
| Amount of unsecured portion of claim: | $241,048.82 |

The FmHA's secured claim shall be allocated to specific collateral as follows:

| | |
|---|---|
| Real Estate | $ 95,200.00 |
| Equipment | 12,302.00 |
| Livestock | 30,762.00 |
| Total: | $138,264.00 |

Of the allowed secured claim, $95,200 is allocated to real property and $43,064 is allocated to chattels. This allocation may be relevant for plan confirmation purposes because the current market interest rates, stipulated by the parties, are different for real property and chattels.

$138,264.00.[30] Under the Debtors' Chapter 11 plan, the FmHA has been placed in a separate class with respect to the secured portion of its indebtedness. 11 U.S.C. § 1122(a); *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581 (6th Cir.1986); *In re Kovich*, 4 B.R. 403 (Bkrtcy.W.D.Mich.1980). No objection has been made to this classification and the classification is not improper.

The FmHA has not accepted its proposed treatment with regard to its allowed secured claim and the FmHA is impaired within the meaning of 11 U.S.C. § 1124. Therefore, all twelve confirmation requirements contained in 11 U.S.C. § 1129(a) have not been satisfied and the Debtors' plan cannot be confirmed under that subsection.[31] However, the Debtors' plan may be confirmed under 11 U.S.C. § 1129(b) if the plan is "fair and equitable" with respect to the FmHA, which is a non-accepting impaired class.[32]

With regard to the FmHA's allowed secured claim, the Debtor seeks a cramdown pursuant to 11 U.S.C. § 1129(b)(2)(A)(i). The first element in that subsection requires the plan must provide that the FmHA will retain its lien on the Debtors' equipment, livestock and real property to secure repayment of its allowed claim.[33]

■ Nowhere in the Debtors' plan does it *explicitly* state that the FmHA will retain the liens on its collateral. However, the court believes the Debtors intend to grant a post-confirmation lien to the FmHA to protect its interest in property.[34] Prior to any confirmation of a proposed Chapter 11 plan in this case, the Debtors must include language in their plan which perspicuously mandates the FmHA will retain its liens to secure repayment of its allowed secured claim. Absent such explicit language, a plan will not be confirmed.

The second element of 11 U.S.C. § 1129(b)(2)(A)(i) mandates that the FmHA receive present value, as of the effective date of the plan, with respect to its allowed secured claim.[35] Applicable legislative history supports this mandate.[36] Whether the

---

**30.** The remaining portion of the FmHA's claim in the amount of $241,048.82 is allowed as an unsecured claim. 11 U.S.C. § 506(a). The FmHA does not object to the treatment of its allowed unsecured claim pursuant to the Debtors' proposed plan.

**31.** Specifically, 11 U.S.C. § 1129(a)(8) has not been met because each class of claims has not accepted the plan or such class is not impaired under the plan.

**32.** 11 U.S.C. § 1129(b)(1) states:
Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**33.** 11 U.S.C. § 1129(b)(2)(A)(i)(I) states:
that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims;

**34.** The court bases its conclusion upon: (1) Article VII, paragraph 5 of the Debtors' plan where

it is stated the Debtors will execute new promissory notes, security agreements and mortgages and deliver such documents to creditors who hold allowed secured claims; (2) statements contained in the Debtors' memorandum of law and supplemental brief, each filed on March 8, 1988, by which it is stated the FmHA has a continuing lien; and (3) oral statements made by the Debtors' counsel at the valuation hearing and confirmation hearing.

**35.** 11 U.S.C. § 1129(b)(2)(A)(i)(II) states:
that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

**36.** "Application of the test under [11 U.S.C. § 1129(b)(2)] subparagraph (A) also requires a valuation of the consideration 'as of the effective date of the plan'. This contemplates a *present value* analysis that will discount value to be received in the future; of course, if the *interest rate paid* is equivalent to the discount rate used, the present value and face future value will be identical. On the other hand, if no interest is proposed to be paid, the present value will be less than the face future value."
H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 414–15 (1977), U.S. Code Cong. & Admin. News

Debtors are giving present value to the FmHA under the proposed plan is the second major contested issue to be determined by this court.[37]

The Debtors' plan proposes that the FmHA will receive interest at the rates set forth in certain promissory notes previously given to the FmHA. Because the FmHA is only a partially secured creditor, the Debtors assert that only some of the FmHA notes are secured and the balance of the notes are unsecured. By analogy to the determination of priorities among perfected security interests or recorded mortgages under Michigan law, the Debtors argue that certain earlier notes, bearing lower contract interest rates, are secured, while the later notes, bearing higher contract interest rates, are unsecured. Basically, the Debtors aver that the priority of the various notes given to the FmHA must be treated in accordance with a "first in time, first in right" analysis.[38]

The Debtors' plan proposes to pay contract interest to the FmHA as set forth in the notes dated July 27, 1977; May 3, 1978; and May 3, 1978 (the second note bearing that date). The respective rates contained in those notes are 8%, 3%, and 8%. The Debtors propose to amortize the major portion of the FmHA's secured claim over a period of four years, which is the "life of the Plan." However, the Debtors further propose to amortize the remaining portion of the FmHA's allowed secured claim over thirty-three years, which is the "remaining life of the note." [39]

Notwithstanding the "present value" confirmation cramdown requirement in 11 U.S.C. § 1129(b), the Debtors rely upon *Cardinal Fed. Sav. and Loan Ass'n v. Colegrove (In re Colegrove)*, 771 F.2d 119 (6th Cir.1985). Specifically, the Debtors argue this court is bound by the following statement:

> We conclude that the most equitable rate to establish in this type of situation is the prevailing market rate of interest on similar types of secured loans at the time of allowance of the creditors claim and the confirmation of the plan in bankruptcy with a *maximum limitation* on such rate to be the underlying contract rate of interest.

*Id.* at 123 (emphasis in original.) The first three FmHA notes bear contract interest rates which are less than current market rates; the Debtors assert that those contract rates will provide the FmHA with present value respecting its allowed secured claim.

The FmHA relies upon language in *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982). Specifically, the FmHA argues that this court is bound by the following passages:

> Section 1325(a)(5)(B) seems to require the Bankruptcy court to assess interest on the secured claim for the present value of the collateral (if it is not to be paid immediately) in order not to dilute the value of that claim through delay in pay-

1978, pp. 5787, 6370, 6371 (emphasis added). Likewise, if the interest rate proposed to be paid is inadequate, the present value would also be less than the face future value.

37. "Present value" is not defined in the Bankruptcy Code. However, it has been defined as "the principal of a sum of money payable at a future date that drawing interest at a given rate will amount to the given sum at the date on which this sum is to be paid." *Webster's Third New International Dictionary of the English Language Unabridged* 1974 (1986). "Present value" has also been recognized as a term of art by the financial community to acknowledge that a dollar received today is worth more than a dollar received in the future. *In re Fisher*, 29 B.R. 542, 543 (Bkrtcy.D.Kan.1983).

38. For the reasons below, the court rejects this argument. The FmHA asserts that, if the court accepted the Debtors' "first in time, first in right" analysis, it could file secured claims with regard to the higher interest bearing notes and unsecured claims as to all other notes. That counter-argument need not be addressed.

39. The language in the plan, which incorporates by reference language in the amended disclosure statement, is extremely confusing to this court. However, to the extent that the first three notes may not cover the FmHA's entire allowed secured claim, the Debtors apparently propose that any remaining secured indebtedness will be paid in accordance with the fourth note, dated May 26, 1978, which bears a contract interest rate of 8%.

ment. In effect the law requires the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan.

....

Rather than tying the interest rate to an arbitrary ten per cent rate, the Bankruptcy Court's solution, or some other arbitrary rate, we hold that in the absence of special circumstances bankruptcy courts should use the current market rate of interest used for similar loans in the region. Bankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans. And where parties dispute the question, proof can easily be adduced.

The reason we do not use an arbitrary rate is that such a rate may vary widely from the current market rate. The theory of the statute is that the creditor is making a new loan to the debtor in the amount of the current value of the collateral. Under this theory, the most appropriate interest rate is the current market rate for similar loans at the time the new loan is made, not some other unrelated arbitrary rate.

*Id.* at 429–31.

The FmHA argues that, absent special circumstances, present value must be determined using current market interest rates; the FmHA asserts only because *Colegrove* involved a special circumstance was the possibility of a non-market interest rate authorized.

What was the "type of situation" referred to by *Colegrove?* Why in that situation did the Sixth Circuit Court of Appeals apparently rule a secured creditor could only receive the prevailing market rate of interest *or* the contract rate of interest, *whichever is less?* Is the *Colegrove* decision inconsistent with the present value requirement set forth in 11 U.S.C. § 1129(b)?

In *Colegrove,* the debtors filed their petition under Chapter 13 of the Bankruptcy Code.[40] At the time of filing, the secured creditor had already instituted a foreclosure action against the debtors' personal residence. At or near the confirmation date of the Chapter 13 plan, mortgage arrearages, accrued through November 30, 1983, totalled $2,967.60. The debtors also had a continuing obligation to make future mortgage payments to the secured creditor.

In *Colegrove,* the debtors proposed to continue to pay all future mortgage payments to the secured creditor and cure the unpaid mortgage arrearage. 11 U.S.C. § 1322(b)(5). However, the debtors did *not* propose to pay any interest, i.e. provide present value, with regard to the arrearage obligation. The bankruptcy court confirmed the debtors' plan over the creditor's objection.

In *Colegrove,* the Sixth Circuit concluded that if interest was not paid on the mortgage arrearage, the creditor would not realize the full present value of the amount owed, relying upon *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982); and *Hardy v. Cinco Fed. Credit Union (In re Hardy),* 755 F.2d 75 (6th Cir.1985). Notwithstanding its conclusion that present value is required, the court

---

**40.** Both *Colegrove* and *Memphis Bank* were Chapter 13 cases and therefore 11 U.S.C. § 1129(b) was not applicable to those cases. 11 U.S.C. § 103(f). However, 11 U.S.C. § 1325(a)(5)(B) states:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> . . . . .
>
> (5) with respect to each allowed secured claim provided for by the plan—
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

The above subsection is very similar to 11 U.S.C. § 1129(b) and also requires that a secured creditor receive present value with regard to its allowed secured claim, as of the effective date of the plan, where the secured creditor has not accepted the plan. However, the Chapter 13 confirmation standards do not explicitly include the concepts of impairment, 11 U.S.C. § 1124, or satisfaction of secured claims by the "realization ... of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii).

then held that the contract interest rate would be sufficient even if that rate was less than the market interest rate. This holding can be explained because under the *Colegrove* plan, the creditor was to be paid its *entire debt as an allowed secured claim;* paying the contract rate would permit "the creditor to achieve substantially the benefit of its bargain." *Cardinal Fed. Sav. and Loan Ass'n v. Colegrove (In re Colegrove),* 771 F.2d 119, 122 n. 3 (6th Cir.1985). Therefore, rather than the Chapter 13 plan compelling the creditor to make a *new loan,* with only a portion of the creditor's total indebtedness paid pursuant to different terms or conditions, the mortgage arrearage default was to be cured under the plan and the *old loan reinstated* in accordance with the parties' previous agreement. In this "type of situation", where contract interest is paid on the arrearage in accordance with the tenor of the parties' original agreement, a fully secured creditor is not significantly harmed. It is therefore understandable why the Sixth Circuit believed the contract rate might be the "most equitable rate." *Id.* at 123.

■ In a Chapter 11 case, notwithstanding acceleration of indebtedness by a secured creditor, a debtor may (1) cure a default, (2) reinstate the maturity of a claim, (3) compensate the holder of a claim for damages occasioned and (4) abide by the legal, equitable and contractual rights held by the secured creditor. When this is accomplished, the claim is deaccelerated and reinstated; therefore, the secured creditor's interest is deemed unimpaired. 11 U.S.C. § 1124(2). An unimpaired secured creditor is conclusively presumed to accept a Chapter 11 plan. 11 U.S.C. § 1126(f).

In *Colegrove,* the treatment of the mortgagee's secured claim under that Chapter 13 plan, including the payment of interest on the arrearage, is very analogous to the concept of being "unimpaired" in a Chapter

11 case. Alternatively, one might argue that the treatment of the secured claim in *Colegrove* had the effect of providing the realization of the "indubitable equivalent" to the secured creditor. Although the concepts of impairment and indubitable equivalence are not included in the Chapter 13 confirmation standards, it is understandable why the Sixth Circuit, under the "type of situation" in *Colegrove,* equitably allowed a contract rate of interest to be paid on the arrearage rather than strictly mandating that a higher current market interest rate be paid.

The Debtors submit that *Memphis Bank* has been modified by *Colegrove* because it was decided before *Colegrove.* Such an argument is misguided. In *Colegrove,* the court cites *Memphis Bank* on four separate occasions. In discussing *Memphis Bank, Colegrove* gives no indication whatsoever that the *Memphis Bank* discussions regarding present value should be doubted. To the contrary, *Colegrove* repeatedly cites *Memphis Bank* approvingly in connection with the Chapter 13 confirmation standard which requires payment of present value to the holders of secured claims. Therefore, this court concludes that *Colegrove* only creates a very narrow exception to the general rule contained in *Memphis Bank; Colegrove's* holding must be strictly limited to its particular facts which involve a debtor's cure of a fully secured creditor's mortgage arrearages under a Chapter 13 plan.

The special circumstances existing in *Colegrove* are further highlighted in Judge Celebrezze's dissent where he focuses upon 11 U.S.C. § 1322(b)(2).[41] The dissent concluded, because the creditor's indebtedness was secured only by real property that was the debtor's principal residence, no modification whatsoever of the obligation is permissible. Therefore, the dissent concluded that, unless a mortgage explicitly provides for interest on arrearages, the secured creditor is not entitled to *any* interest on the mortgage arrearage in a *Colegrove* type of situation.

41. 11 U.S.C. § 1322(b)(2) states:
[T]he plan may—
modify the rights of holders of secured claims, other than a claim secured only by a

security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

■ In this case, the FmHA's indebtedness is cross-collateralized and the indebtedness is not secured solely by the Debtors' principal residence. Chapter 11 contains no provision which is arguably similar to 11 U.S.C. § 1322(b)(2). Therefore, the "type of situation" which existed in *Colegrove* cannot exist in this Chapter 11 case.

Finally, and most importantly, the Debtors' argument ignores the plain language of the Chapter 11 confirmation standards. Contract interest rates are often not equivalent to current market interest rates. In this case, the proposed interest rates of 3% and 8% do not constitute present value. The current interest rates are now 9% with respect to chattels and 9½% with respect to real property. To confirm the Debtors' Chapter 11 plan, current market interest rates must be provided to the FmHA with respect to its allowed secured claim.[42]

Pursuant to a Chapter 11 cramdown, the Debtors now attempt to compel the FmHA to make new involuntary loans in the amount of the FmHA's allowed secured claim, i.e. $95,200.00 secured by real estate and $43,064.00 secured by livestock and equipment. Under Chapter 11, the Debtors may cramdown the FmHA and compel it to make a new loan *only if* the treatment of the FmHA's allowed secured claim meets the confirmation requirements of 11 U.S.C. § 1129(a) and (b).

This court does not have the power to rewrite a Chapter 11 plan; the burden is upon the proponent, here the Debtors, to propose a confirmable plan. The court's obligation is merely to determine whether any proposed plan complies with all confirmation standards set forth in 11 U.S.C. § 1129(a) and (b). *5 Collier on Bankruptcy* ¶ 1229.03[3][a] at 1129–47 (15th ed.1988).

The Debtors' proposed plan does not satisfy the confirmation requirements of 11 U.S.C. § 1129(a) and (b) because the plan: (1) does not explicitly provide the FmHA will retain its lien on the chattels and real

property and (2) the plan does not provide the FmHA will be paid present value, i.e. the current market interest rate, on its allowed secured claim. Confirmation of the Debtors' proposed plan is denied. However, in its discretion, the court will permit the Debtors a period of thirty days to file an amended plan and disclosure statement which will comply with 11 U.S.C. § 1129.

An order shall be entered accordingly.

---

**42.** The parties have stipulated to the current market rates. Absent such a stipulation, this court believes determination of current market interest rates should include inquiry into such factors as the terms, duration, collateral and risk of similar loans made by the creditor to third persons. *5 Collier on Bankruptcy* ¶ 1129.03[4][i] at 1129–62 to –63 (15th ed.1988).